UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
DONNA MARIE ROSA,
*as Administratrix of the Estate of Nicole Ann Garbellotto, deceased*,

                       Plaintiff,

       - against -

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, *et al.*,

                       Defendants.
---------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

18-cv-1384 (BMC)

**COGAN**, District Judge.

    This case arises from a sad incident in which a young woman, Nicole Ann Garbellotto, died from a self-administered drug overdose. Her mother, as Administratrix, has sued the Triborough Bridge and Tunnel Authority (the "TBTA") and its individual officers (together, the "TBTA Defendants"), who found her unconscious and took her to the hospital;[1] the hospital (Staten Island University Hospital, or "SIUH") and hospital personnel who treated her (together, the "SIUH Defendants"); and the City of New York and police officers who took custody of Garbellotto after her discharge from the hospital (together, the "City Defendants").

    The City Defendants have moved for summary judgment, which is granted for the reasons stated below. Although Garbellotto's death was tragic, no reasonable juror could find in favor of plaintiff on her federal claims, and the Court declines supplemental jurisdiction over the remaining state law claims.

---

[1] In its November 15, 2018 order, the Court dismissed the claims against the TBTA Defendants.

**BACKGROUND**

TBTA personnel found Garbellotto unresponsive in a vehicle at the Verrazano Bridge toll plaza and placed her under arrest for DUI. Shortly thereafter, emergency medical technicians revived Garbellotto by administering Narcan[2] and transported her to SIUH. At SIUH, Garbellotto received two more doses of Narcan and, hours later, the director of medical toxicology at SIUH recommended that she be cleared for discharge into police custody. Garbellotto's discharge instructions indicated that she was stable, alert and oriented, not in respiratory distress, had vital signs within the normal limits, and did not have a high risk of death.

TBTA personnel then brought Garbellotto to the 120th precinct, where defendant Denis Samuylin was at the front desk. Samuylin learned that Garbellotto had been arrested and arrived from SIUH. TBTA personnel took Garbellotto to be photographed, fingerprinted, and searched in front of NYPD personnel. NYPD personnel then searched Garbellotto by going through her pockets, patting her down, shaking out her clothes, and having her walk through a metal detector; Garbellotto had no contraband. According to NYPD personnel, Garbellotto did not mention having any medical condition and appeared normal, coherent, not intoxicated, and not in need of medical attention. An NYPD officer unsuccessfully attempted to give Garbellotto a retina scan; the officer believes that Garbellotto was able to open her eyes for long enough a retina scan, but the retina scan failed for reasons the officer cannot recall.

Garbellotto then entered her cell. Defendant Ericka Dendy, a cell attendant, noted that Garbellotto was in good condition and gave her juice to drink when Garbellotto indicated that she was thirsty. Dendy indicated that Garbellotto did not request any medical attention. Dendy

---

[2]Narcan is a type of medication used to block the effects of opioids. It can treat narcotic overdoses in emergency situations.

stated that she inspected Garbellotto's cell every half an hour, as cell attendants are required to perform routine inspections of each cell every half an hour. Between these physical checks, cell attendants sit in a designated desk area that has two monitors where cell attendants can monitor the cells using surveillance cameras.

Defendant Dawn Susi-Ortiz also inspected the cells of the female detainees with another police officer around this time. An interviewer for the New York City Criminal Justice Agency interviewed Garbellotto and observed that she appeared normal, was coherent and cooperative, and answered all of the interviewer's questions. The interviewer also indicated that Garbellotto did not request any medical attention.

Shortly after Garbellotto's interview, defendant Nancy Heinz took over Dendy's routine cell inspection duties. Heinz indicated that she monitored Garbellotto every half an hour and did not observe anything unusual for the next four hours. Approximately four hours and twenty minutes into Heinz's shift, Heinz noticed that Garbellotto was sitting in a strange manner, as if she had fallen off of the bench in the cell. Heinz entered the cell, performed CPR, pulled an alarm, and yelled for another officer to call for an ambulance.

Medical personnel arrived and noted that Garbellotto looked pale but with normal skin temperature and no indications of trauma. They removed her to a hospital, where she was pronounced dead of cardiac arrest.

Plaintiff then brought this action. Plaintiff brings federal claims against the City Defendants for indifference to serious medical needs in violation of the Fourth and Fourteenth Amendments to the United States Constitution, as well as failure to intervene to prevent that constitutional deprivation. Plaintiff also brings state claims against some or all of the City Defendants for wrongful death, negligence, intentional infliction of emotional distress, negligent

infliction of emotional distress, negligent hiring and training, and negligent training and supervision.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted). A plaintiff must put forward some "concrete evidence from which a reasonable juror could return a verdict in his favor" to withstand a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

I. **Federal Law Claims**

   A. **Deliberate Indifference**

To prevail on a deliberate indifference claim, a plaintiff "must show that she had a serious medical condition and that it was met with deliberate indifference." Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000) (internal quotation marks omitted). To determine whether defendants acted with deliberate indifference under the Fourteenth Amendment, courts employ "an objective standard, i.e., whether a reasonable person would appreciate the risk to which the detainee was subjected." Bruno v. City of Schenectady, 727 F. App'x 717, 720 (2d Cir. 2018) (internal quotation marks omitted). Courts also employ an objective standard to evaluate a claim for deliberate indifference to medical needs under the Fourth Amendment. See Arum v. Miller, 331 F. Supp. 2d 99, 111 (E.D.N.Y. 2004). "This objective standard requires the Court to focus on the circumstances confronting the police at the time of the arrest without regard to their

underlying motives or attitude towards the suspect." Id. (internal quotation marks, citations, alterations omitted).

Deliberate indifference entails more than negligence, but less than conduct undertaken for the very purpose of causing harm or with knowledge that harm will result. See Farmer v. Brennan, 511 U.S. 825 (1994). Thus, "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2472 (2015) (internal quotation marks omitted).

Here, no reasonable juror could find that City Defendants' conduct constituted deliberate indifference to Garbellotto's medical needs under the Fourth or Fourteenth Amendment. To the contrary, the individual City Defendants physically examined Garbellotto; provided her with juice; and regularly monitored Garbellotto's condition when she was in her cell. Her interactions with various NYPD personnel all indicate that she appeared to be normal, and as soon as Heinz noticed that Garbellotto appeared to require medical attention, Heinz performed CPR, pulled the alarm, and yelled for another officer to call medical personnel, who quickly arrived to treat Garbellotto.

There is no evidence that she requested medical attention from the City Defendants, and there is no reason to believe any of these defendants would have refused medical attention if she requested it. Under these circumstances, the individual City Defendants acted reasonably to monitor Garbellotto and were reasonably attentive to her medical needs, despite Garbellotto's death.

Plaintiff's arguments to the contrary are not persuasive. Plaintiff contends Samuylin should have ordered an increase in the frequency of the physical inspections of Garbellotto's cell in light of her discharge from SIUH. Even if, in some cases, it may be appropriate to find that

5

the Constitution requires physical inspections of detainees that occur more frequently than every half an hour, such judicial micromanagement of police supervision of detainees would be inappropriate here. As "a layperson", Samuylin was "entitled to rely on the opinions of the medical staff" at SIUH, who determined that Garbellotto's condition was stable enough for her to be released into police custody. Phelan v. Chin, 10-cv-6344, 2012 WL 3597409, at *2 (W.D.N.Y. Aug. 20, 2012).

Plaintiff disagrees with decisions that SIUH personnel made in treating Garbellotto, but "mere disagreement over the proper treatment does not create a constitutional claim." Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998). Nor did the Constitution require Samuylin or any other individual City Defendant to order additional medical treatment for Garbellotto based on their lay assessment of her medical condition. "One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given to particular prisoners – for whatever reason." Cuoco, 222 F.3d at 111.

Plaintiff also contends that Susi-Ortiz could be liable since she was present when EMTs arrived to treat Garbellotto after Heinz called for medical assistance. Plaintiff infers that Susi-Ortiz therefore "knew, or should have known, the risk Ms. Garbellotto was in." To the extent plaintiff suggests that Susi-Ortiz should have taken some additional actions to treat Garbellotto as the EMTs arrived, plaintiff fails to identify any act that would have helped Garbellotto – rather than merely interfering with her treatment by medical professionals – let alone any additional action that the Constitution required Susi-Ortiz to have taken.

Moreover, plaintiff blames Heinz for her conduct between her inspections of Garbellotto's cell. Plaintiff speculates that Garbellotto may have fallen well before anyone discovered her, but Heinz may not have noticed "due to the practice of cell attendants watching

6

TV, cell talking on the phone, looking at her phones, and doing crossword puzzles." The record is not clear about how often, if ever, Dendy or Heinz watch TV, use their phones, or do crosswords while at their desk area, and there is no reason – apart from plaintiff's speculation – to believe that Heinz was too distracted from her monitoring duties to notice that Garbellotto had fallen well before Heinz noticed. Heinz's regular inspection of Garbellotto's cell further reduces the likelihood that she fell well before anyone noticed.

### B. Failure to Intervene

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). "If the Court determines that the officer's conduct did not violate a constitutional right, however, the analysis [of a failure to intervene claim] ends." Feinberg v. City of New York, 99-cv-12127, 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004).

Because plaintiff has not shown that any of Garbellotto's constitutional rights were violated, the failure to intervene claims are dismissed.

### C. Qualified Immunity

"Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Coollick v. Hughes, 699 F.3d 211, 221 (2d Cir. 2012) (internal quotation marks omitted). Thus, qualified immunity "shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." Bradway

v. Gonzales, 26 F.3d 313, 317-18 (2d Cir. 1994) (internal citations and quotation marks omitted). This standard protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Here, even if plaintiff's deliberate indifference or failure to intervene claims survived, the individual City Defendants would be protected by qualified immunity. They physically examined Garbellotto; provided her with juice; and regularly monitored Garbellotto's condition when she was in her cell. There is no evidence that Garbellotto requested medical attention, and once Heinz discovered that Garbellotto needed such attention, she performed CPR, pulled the alarm, and yelled for another office to call medical personnel, who quickly arrived to treat Garbellotto. The individual City Defendants' conduct was thus well within the scope of qualified immunity.

### D. Monell

Plaintiff brings a claim against the City of New York under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 654 (1978) ("[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury … the government as an entity is responsible under § 1983."). However, courts dismiss Monell claims when there is no underlying constitutional violation. See Segal v. City of New York, 459 F.3d 207 (2d Cir. 2006).

Plaintiff seeks to hold the City of New York liable under Monell for the individual City Defendants' purported constitutional violations. But since there was no underlying constitutional violation, the Monell claims are dismissed.

## II. State Law Claims

Under 28 U.S.C. § 1367(c), a district court may "decline to exercise supplemental jurisdiction over a claim" if the district court "has dismissed all claims over which it has original jurisdiction." Indeed, the Supreme Court has directed that, except in unusual circumstances, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966). Dismissal of the state claims avoids "[n]eedless decisions of state law," which "should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." Id.

Thus, "[t]he strong preference in this Circuit is for district courts to decline to exercise supplemental jurisdiction under § 1367(c)(3) when all of the federal claims are dismissed from the suit prior to trial." Schiffman v. Epstein, 04-cv-2661, 2009 WL 1787760, at *7 (S.D.N.Y. June 23, 2009). When the federal claims are dismissed before trial, courts only retain supplemental jurisdiction in unusual circumstances, including "when the remaining state law claims are linked to unique federal interests, when dismissal of the federal claims comes days before the commencement of trial, when the court has expended significant time in discovery and dispositive motion practice prior to dismissal of the federal claims, and when the state law claims do not present novel questions of state law." Id.

Having dismissed all federal claims in this case before commencing or even scheduling trial, the Court declines to exercise supplemental jurisdiction over the remaining claims in this case, which are only state law claims. The state law claims, primarily based on negligence and similar causes of action, do not implicate any federal interests and raise entirely different legal issues than any federal claim for a constitutional violation, since "liability for *negligently*

9

inflicted harm is categorically beneath the threshold of constitutional due process." Kingsley, 135 S. Ct. at 2472 (internal quotation marks omitted).

The City Defendants have raised statute of limitations defenses to plaintiff's state law claims, and – as the Court noted in its November 15, 2018 order – New York state courts are in the best position to resolve statute of limitations defenses that arise entirely under state law. Plaintiff's remaining causes of action also include claims for medical malpractice against the SIUH Defendants. Since the regulation of medical malpractice and medical malpractice insurance is a significant interest of New York State, adjudicating medical malpractice claims is more appropriate for state than for federal court. See All. of Am. Insurers v. Cuomo, 854 F.2d 591, 600 (2d Cir. 1988).

Further, the Court's prior involvement in this case does not constitute an extraordinary circumstance that would prevent the Court from declining to exercise supplemental jurisdiction. The Court has only had minimal involvement in the discovery in this case, and the Court has not determined the admissibility of plaintiff's proposed expert witness or issued any evidentiary rulings in this case. The Court's prior involvement in dispositive motion practice was limited to its November 15, 2018 order resolving a motion to dismiss by the TBTA Defendants that related solely to the TBTA Defendants' interactions with Garbellotto and raised separate issues from any remaining state claims in this case.[3]

---

[3] In the November 15, 2018 order, the Court also dismissed all federal claims against the TBTA Defendants, and declined supplemental jurisdiction over plaintiff's state claims against these defendants in light of the dismissal of the federal claims. Now that all federal claims have been dismissed, there is an even more compelling justification for declining supplemental jurisdiction over the state claims here than there was in connection with the November 15, 2018 order.

## CONCLUSION

The City Defendants' [72] motion for summary judgment is granted with prejudice with respect to the federal claims and without prejudice with respect to the state claims. All remaining state claims in this action are dismissed without prejudice. The SIUH Defendants' [86] motion to exclude expert witness testimony is denied as moot. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

                                                                   U.S.D.J.

Dated: Brooklyn, New York
       August 6, 2019